IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

KAYLA CLARK, ADMINISTRATRIX AND
ON BEHALF OF ALL HEIRS AT LAW AND
WRONGFUL DEATH BENEFICIARIES
OF JONATHAN SANDERS, DECEASED                                  PLAINTIFFS

V.                                            CIVIL ACTION NO. 2:16-CV-101-KS-MTP

KEVIN HERRINGTON, IN HIS OFFICIAL AND
PERSONAL CAPACITIES; CITY OF STONEWALL;
STONEWALL POLICE DEPARTMENT; BOARD OF
ALDERMEN IN THEIR OFFICIAL CAPACITIES;
AND JOHN DOES 1-10                                              DEFENDANTS

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO THE DEFENDANTS'
MOTION TO DISMISS BASED ON QUALIFIED IMMUNITY**

---

COMES NOW the Plaintiffs Kayla Clark, Administratrix and on behalf of all heirs at law and wrongful death beneficiaries of Jonathan Sanders, deceased, and files this brief in opposition to the "Motion To Dismiss Based On Qualified Immunity" submitted by the defendants, and would show this Honorable Court the following:

**INTRODUCTION**

This case was filed after Defendant Kevin Herrington slowly strangled Jonathan Sanders to death and then refused to allow anyone to administer CPR, even though it was apparent that Sanders was not breathing, was unresponsive and, eventually, had no pulse. Herrington, who had not yet attended the police academy, was on duty late at night in a city vehicle, in police uniform and carrying his service pistol, and was apparently carrying out his duties with his wife in the vehicle with him. Based upon statements taken by the Mississippi Bureau of Investigation shortly after the incident, it is clear that there will be issues of material fact as to whether Herrington fabricated his supposed reason

for stopping Sanders, while Sanders was traveling by horse and buggy, as well as his claim that he strangled Sanders because Sanders supposedly tried to grab Herrington's pistol.

Although the motion is styled as one based upon qualified immunity, it is clear that it is based solely upon the sufficiency of the pleadings. Motion To Dismiss Based On Qualified Immunity, Para. 7. Therefore, in conjunction with this response, the Plaintiffs are filing an Amended Complaint pursuant to F.R.Civ.P. 15(a)(1)(B). The Defendants' motion is, therefore, addressed below with reference to the Amended Complaint.

## STANDARD OF REVIEW

F.R.Civ.P. 8(a)(2) requires that a pleading make a claim for relief that contains "a short and plain statement of the claim showing that the pleader is entitled to relief." A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted" to test whether the complaint falls short of the standard.

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 555 (2007), United States Supreme Court clarified the standard of pleading required under Rule 8.

> A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(internal citations and punctuation omitted)(citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-558(2007).

"Viewing the facts as pled in the light most favorable to the nonmovant, a motion to dismiss or for a judgment on the pleadings should not be granted if the complaint provides 'enough facts to state a claim to relief that is plausible on its face.'" *Jebaco, Inc. v. Harrah's Operating Co., Inc*. 587 F.3d 314, 318 (5th Cir. 2009)(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570(2007). See also, *Parks, Inc. v.*

*Southeastern Advertising & Sales Systems, Inc.*, 30 F.3d 627, 629 (5th Cir. 1994).

"Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context–specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. At 679. The complaint must be read with great generosity on a motion to dismiss. See e.g.*Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555, 558 (2nd Cir. 1985).

### FACTS TAKEN FROM THE AMENDED COMPLAINT

On or about July 8, 2015, Jonathan Sanders was lawfully riding in a buggy drawn by a horse. A friend of Sanders, David Brister, passed him in a truck, stopped in the middle of the road, and spoke. Sanders told Brister to not stop in the middle of the street to talk. To do so would have been a traffic violation as well as unsafe in the dark.

Defendant Kevin Herrington was parked in the dark in a City of Stonewall police car with his wife also in the car. He was on patrol late at night, unsupervised. He had not yet attended the Law Enforcement Training Academy's basic police officer training course, despite having acted as a police officer for some period of time. Herrington witnessed Brister speaking to Sanders. Herrington believed that Brister had had warrants for unpaid fines at some point in the past. Herrington then followed Brister and pulled him over in the parking lot of a gas station. Herrington learned from Brister that the fines had been paid and there were no more warrants for him. Herrington decided to not write Brister a ticket despite witnessing him committing a traffic violation.

Herrington then questioned Brister about what Sanders was doing and what they talked about. Herrington claims that Brister told him that Sanders wanted to sell him drugs. This is completely false and was part of the story made up after the fact to justify Herrington stopping Sanders.

Herrington then drove around Stonewall until he found Sanders. Officer Herrington demanded that Sanders pullover and then followed him as he pulled into a relative's yard. Herrington had no

reason to stop Sanders, whom he knew.  Herrington, either with his police lights, or approaching Sanders, startled Sanders' horse. When Sanders went to control his horse, Herrington grabbed Sanders from behind and ended up wrestling him to the ground.

Herrington later claimed that Sanders tried to get his gun and that he had managed to get it out of Herrington's holster. This too is completely false.  Sanders did not resist or try to fight Herrington, other than try to breathe and not choke to death.  Herrington, who apparently claims to know some martial art, held Sanders in a choke hold until long after he quit moving, breathing or was otherwise responsive.

A relative of Sanders who lived in the house where this attack took place, Rachel Williams, came out of the house and witnessed Herrington holding Sanders on the ground in a choke hold. Williams could see that Sanders was not responsive and wasn't breathing. She began telling Herrington that he wasn't breathing and begged Herrington to let Sanders up to breathe.

At some point while Herrington was strangling Sanders, he asked his wife to remove his pistol. Williams, who was employed by the Sheriff's office, offered to help, but Herrington said no. Herrington's wife, who was terrified, was unable to remove his pistol from his holster, so Williams had to tell her how to pull the pistol out of her husband's holster.  Herrington refused to release the choke hold for a number of minutes, but kept strangling Sanders long after he had quit breathing or moving in any fashion.

Williams kept pleading with Herrington to allow her to do CPR on Sanders.  Even after Herrington released Sanders, he refused to allow Williams to do CPR on Sanders, even though it was obvious that Sanders was not breathing.  Once Herrington released Sanders, he handcuffed Sanders' comatose body and left him lying there without allowing the pleading Williams to do CPR.

Herrington told his wife to use the radio to call for help, which she did not know how to do. Williams had to help her give directions to the location.

Two other officers, including Stonewall police officer Derrick Thomas, arrived before the ambulance. Both were aware that Sanders was not breathing, and became aware that he had no pulse, but took no action to try to revive Sanders. Still Williams was not allowed to administer CPR.

Before the ambulance arrived, Herrington told the other responding officers that he thought he had "put [Sanders] to sleep." Apparently, Herrington had intentionally been trying to choke Sanders into unconsciousness even though Sanders was doing nothing but trying to breathe. Herrington clearly lost control and became irrational. This is easily understandable in light of his lack of training provided by the city of Stonewall, Mississippi. This may have been exacerbated by the fact that his wife was present and even participating at his request.

By the time the ambulance arrived many minutes later, Sanders was long dead and CPR administered by the EMT was fruitless. Sanders did not pose any threat to Herrington, either before Herrington became violent, during the assault, after he stopped breathing and moving, or once he was handcuffed while not conscious or breathing. Herrington later claimed that he had patted Sanders down and found a baggie of a white powdery substance. This was false. Even if it were not false, Harrington had no reason to stop Sanders.

For arguendo, even if it were true, this did not give Herrington the right to strangle Sanders to death and then prevent him from receiving medical attention. Herrington had not been properly trained, and has only recently attended the police academy. Herrington was deliberately indifferent to Sanders rights to not be stopped and searched without a reason. Herrington was also deliberately indifferent to Sanders rights to be free from the use of excessive force, or any force at all in this situation.

Further, the fact that Herrington continued to choke Sanders long after he had stopped breathing, moving or otherwise responding, and then refused to allow anyone to administer CPR for a long period of time demonstrates a deliberate indifference to whether Sanders lived or died. At the time of his death, Mr. Sanders was only thirty nine (39) years old.

At all times, Kevin Herrington was acting in his capacity as a police officer for the town of Stonewall Mississippi. The Aldermen, Mayor, and Police Chief of Stonewall Mississippi were all aware that Herrington was untrained and that he had been given a city vehicle, a city weapon, a uniform and badge, and then placed on duty by himself at night without supervision. The decision and knowledge of these policymakers for the city of Stonewall to allow this to happen constituted a policy and practice on the part of the city. This practice directly resulted in the death of Mr. Sanders.

By their actions, the Aldermen, Mayor, and Police Chief of Stonewall, Mississippi exhibited reckless disregard for the rights and safety of its citizens in general, and Mr. Sanders in particular. The fact that Sanders felt free to take his wife on patrol with him, an act which obviously creates inherent dangers for the officer and others, demonstrates a lack of proper training and supervision. The fact that neither Herrington or another Stonewall officer carried out emergency CPR, or even allowed it to be done, demonstrates a serious lack of training regarding when and how to respond to easily foreseeable medical emergencies.

The City of Stonewall has a practice of allowing untrained officers to patrol its streets. The city and the individual defendants are aware of officers violating city policies and constitutional standards without proper oversight or discipline. Such practices but the public in easily foreseeable danger. At all times, the defendants acted under color of law.

## PLAINTIFFS' STATE LAW TORT CLAIMS

First, the Plaintiffs concede that the Mississippi Tort Claims Act does not create liability for individuals acting within the course and scope of their employment, and the amended complaint clarifies that no such claims are made. Further, the Plaintiffs recognize that official liability for certain intentional torts is barred under the MTCA.

The Plaintiffs, however, have pled in the alternative several theories of state law negligence, including that Herrington's actions in strangling Sanders and then not allowing him to receive

appropriate medical attention in a timely fashion were negligent. Such claims of negligence are, of course, permitted under the MTCA. Whether or not Herrington's acts were intentional or negligent or somewhere in between, the Aldermen, Mayor, and Chief of Police, all in their individual capacity, acted negligently under state law in their failure to either train and supervise Herrington or to see that it was done.

The MTCA does permit governmental liability for the act or omission of an employee engaged in police activities where "the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury…" *Miss. Code Ann.* §11-46-9(1)(c). In this case, the Defendants concede that even the original Complaint pleads that Sanders was not engaged in criminal activity at the time of his death. The same must certainly be true for the more factually detailed Amended Complaint. This will eventually be an issue of material fact, and not one to be determined on a motion on the pleadings.

**WHETHER THE PLAINTIFFS HAVE SUFFICIENTLY PLED THAT HERRINGTON ACTED WITH RECKLESS DSREGARD OF SANDERS SAFETY AND WELL-BEING**

The issue raised by the Defendants is whether the Plaintiffs have sufficiently pled that Herrington acted with reckless disregard of Sanders safety and well-being.

The Mississippi Supreme Court has found reckless disregard where "the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Maldonado v. Kelly*, 768 So.2d 906, 911-12 (Miss. 2000)(quoting *Maye v. Pearl River County*, 758 So.2d 391, 394 (Miss. 1999). In *Maldonado*, the court found reckless disregard where officers conducted a high-speed chase through busy streets where they had to know that a wreck was very likely to happen. In *Maye*, the court found that an officer acted in reckless disregard when he showed the "conscious disregard for the safety of others when he backed up an incline entrance to a parking lot, knowing he could not be sure the area was clear. While the officer was backing up the entrance, a

driver entered the lot from the road and noticed the police car backing towards her. The driver could not back up and began using her horn to notify the officer that she was behind them. The officer never stopped and ultimately collided with the vehicle." (As discussed in *Mississippi Department of Public Safety v. Dunn*, 861 So.2d 990 (Miss. 2003)).

The facts pled in this case are much worse than those in *Maldonado* or *Maye*. In the case sub judice, Herrington apparently intended to put some sort of a "sleeper" hold on Sanders and render him unconscious. Choking someone into unconsciousness is clearly a highly dangerous and risky move. He continued choking Sanders long after Sanders quit breathing and was unresponsive. And even after letting Sanders go, and despite knowing that Sanders was not breathing, he refused to allow anyone to administer CPR. This was a risk so obvious that "he must be taken to have been aware of it…" The high probability of harm from these actions is undeniable.

When examining whether the Defendant exhibited reckless disregard, the Court needs to look at "the totality of the circumstances." *Phillips v. Mississippi Department of Public Safety*, 978 So.2d 656, 661 (Miss. 2008). Far from considering the "split–second" circumstances cited by the Defendants, the Court must take into consideration the fact that this event took place over the course of 20 or 30 minutes, allowing Herrington a great deal of time to consider the circumstances and Sanders' obviously impending death.

The Plaintiffs have clearly pled reckless disregard sufficiently to meet the test of *Miss. Code Ann.* §11-46-9(1)(c). This is especially true in light of the fact that the eventual burden of proof on this issue is merely a "preponderance of the evidence." *Simpson v. City of Pickens*, 761 So.2d 855, 859 (Miss. 2000).

Several other theories of state law torts sounding in negligence have been sufficiently pled. Under the facts pled above, and under the theory that Sanders' death was caused by some degree of negligence short of intentional conduct, the plaintiffs have pled the legal theory of negligent infliction

of emotional distress, wrongful death and gross negligence.

Negligent infliction of emotional distress occurs when someone fails to use reasonable care in their actions in this negligence results in emotional distress and mental anguish to another. The conduct need not be malicious, intentional or outrageous, but there must be some kind of demonstrative harm, and that harm must have been reasonably foreseeable by the defendant. *Adams v. U.S. Homecrafters, Inc.*, 744 So.2d 736, 742 (Miss. 1999).

The plaintiffs have pled a cause of action under Mississippi's wrongful death statute, Miss. Code Ann. §11-7-13. An action for wrongful death may be brought pursuant to the Mississippi Tort Claims Act. See e.g., *Caves v. Yarbrough*, 991 So.2d 142 (Miss. 2008).

The Plaintiffs' Amended Complaint alleges a negligent failure to train and supervise its officers on the part of the city and its officials. Cities are not allowed to put untrained, armed police officers on the streets to patrol unsupervised at will. Training and supervising its officers is not a discretionary duty. It is required by state law. Even if there is some discretion in how officers are trained or supervised, the fact of supervision and training is clearly ministerial in nature. A function is ministerial "if the duty is one that is been positively imposed by law and its performance required at a time and manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officers judgment or discretion." *Marshall v. Chawla*, 520 So. 2nd 1374, 1375 (Miss. 1988). Sending an officer to the Academy is a requisite of law and certain limitations are opposed upon officers who have not been certified.. This duty is not met by sending an uncertified officer to patrol out on his own.

Additionally, the Defendants do not even discuss the issue of Herrington's liability for any intentional state law torts that have been pled. A governmental actor is not entitled to immunity when he has committed an intentional tort such as battery. *Webb v. Jackson*, 583 So.2d 946, 951 (Miss. 1991).

To the extent that the Plaintiffs have pled intentional torts against Defendant Herrington, he is

not entitled to dismissal of these claims based upon the MTCA, as that statute has no bearing on those claims. To the extent there may be tension between the legal theories involving intentional torts outside the ambit of the MTCA and claims of negligence with reckless disregard which do fall under the act, it is perfectly legitimate for the Plaintiffs to alternatively plead contradictory theories or facts in the complaint. F.R.Civ.P. 8(d)(2).

## THE PLAINTIFFS HAVE ADEQUATELY PLEAD THEIR FEDERAL CLAIMS BROUGHT UNDER 42 U.S.C. §1983

### A. Plaintiffs' claims against Defendants in their individual capacities

In assessing a motion to dismiss based on qualified immunity, a court must first determine whether or not the plaintiffs have sufficiently alleged facts which establish that the defendants violated a clearly established constitutional right. *Price vs. Roark*, 256 F.3d 364, 369(5th Cir. 2001). If this is the case, then the court must determine whether the official conduct was objectively unreasonable under established law. *Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001).

### Unlawful Search and Seizure, Excessive Force, Unreasonable Denial of Medical Care and "Bystander" liability.

Any seizure and search of a person where there is no reasonable suspicion or probable cause is objectively unreasonable. The Plaintiffs have adequately pled that Herrington had no reasonable suspicion that Sanders was engaged in criminal activity. He witnessed Sanders legally traveling the streets of Stonewall in his horse-drawn buggy. He further witnessed Sanders tell his friend that they could not stop their vehicles in the middle-of-the-road and talk. Moving on was the only safe thing to do, especially as it was late at night. That is what Herrington witnessed. This does not give rise to an opportunity to go search the town for Sanders, pull him over and then search him. Herrington was clearly aware of that fact when he later made up the story that Brister told him that Sanders wanted to sell him drugs.

Under these circumstances, the stop and search them were obviously both unconstitutional and

unreasonable. Even if this were not the case, Herrington used excessive force. He clearly was aware that he had done so when he made the false statement that Sanders had tried to grab his pistol.

Even if there is force that is originally reasonable, continued use of such force after it is become evident that the threat justifying the forces vanished becomes unreasonable. *Lytle v. Bexar County*, Tex., 560 F.3d 404, 413 (5th Cir. 2009); *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2004)("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). "A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." *Abraham v. Raso*, 183 F.3d 279, 294 (3rd Cir. 1999).

In the case sub judice, based upon the pleadings, the initial stop was unconstitutional and unreasonable. Any related force afterward must also be so. Further, any force was excessive once Sanders was clearly not moving, not breathing, and not responsive in any fashion. And yet Herrington kept strangling him, despite Williams' pleas that he stop! Once Herrington became aware of Sanders need for medical attention, he refused to allow anyone to provide it until much later, and much too late to save his life. This act in itself constitutes deliberate indifference in violation of Sanders constitutional rights. *Smallwood v. Renfro*, 708 F. Supp. 182, 186-188 (N.D. Ill. 1989).

Further, Defendant Officers Merritt Barry and Derrick Thomas have "bystander" liability in this situation. They were not present during the initial stop and search, or while Herrington was choking the life out of Sanders. Once they arrived, however, they became aware that Sanders was not breathing. Officer Merritt Barry actually checked Sanders pulse and could not find one. Perhaps Sanders was already beyond resuscitation at that point. No one will ever know because these officers never made any effort to do so, and stood by and acquiesced in Herrington's decision to prevent any medical treatment until too late. Herrington apparently told these officers that he thought he had put Sanders "to sleep." Knowing that, and seeing that Sanders was not breathing and had no pulse, they had an obvious duty to refuse to allow Herrington to interfere with preferred medical treatment. "[A]n officer who is

present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). Liability can attach when the bystander officer "had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Id.* The same obviously applies where they witness an officer refusing to allow a clearly injured person any medical treatment which might save their life.

### Procedural and Substantive Due Process

"The right to be free of state–occasioned damage to a person's bodily integrity is protected by the 14th amendment guarantee of due process. The right has also been premised on the fourth amendment guarantee of '[T]he right of … people to be secure in their persons,' made applicable to the states by the 14th amendment. *Shillingford v. Holmes*, 634 F. 2d 263, 265 (5th Cir. 1981)(citing *Hall v. Tawney*, 621 F. 2d607, 613 (4th Cir. 1980) and *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970)).

As discussed above, Sanders' bodily integrity was violated by the Defendants in an objectively unreasonable fashion in several ways, and these violations caused his death. In addition to Sanders' procedural due process rights, his substantive due process rights under the 14th amendment were also violated.

"A plaintiff seeking to recover for a substantive due process violation must show '(1) that he was deprived of a life, liberty, or property interest (2) in an arbitrary and capricious manner.'" *Vincent v. City of Sulphur*, 28 F.Supp.3d 626, 642 (W.D. La. 2014)(quoting *Saucedo-Falls v. Kunkle*, 299 Fed. App'x 315, 319 (5th Cir. 2008)). Whenever police use methods which are "so brutal and so offensive to human dignity," that they "shocked the conscience…," a person's substantive due process rights have been violated. *Chavez v. Martinez*, 538 U.S. 760, 773 (2003). There is obviously very little that is more arbitrary and capricious than choking someone to death when no force at all is called for. Further, it can only be arbitrary and capricious, as well as shocking to the conscience to continue to strangle

someone and cut off their air long after they are unconscious and unresponsive because you apparently lost control in a stressful situation of your own making. It is further shocking to the conscience to refuse to allow someone to administer CPR to someone who is in handcuffs and has stopped breathing, or whose heart has stopped beating. There is no procedural protection fit to support such an action. Conduct that is "intended to injure in some way unjustifiable by any government interest" is likely to be conscious shocking. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

The Plaintiffs have adequately pled claims for both procedural and substantive due process violations.

### **Plaintiffs Have Adequately Pled Their Claim for Failure to Train and Supervise**

Defendant Herrington has only recently attended the standard police academy law enforcement training course, well after the events addressed in this action. The Mayor and Aldermen of the City of Stonewall had to have been aware when they hired Herrington that he had not attended the police academy, and were aware that he continued to work unsupervised as a police officer for a long time without having done so.

Everyone has to agree that it is critical to use special caution and care in the hiring, training, and supervision of a police officer, as the city is giving that person a police vehicle, a uniform, a badge and a gun to enforce the authority of the city and state through means up to, and including, killing its citizens.

"It is clear that a municipality's policy of failing to train its police officers can give rise to §1983 liability. '[t]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.'" *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000)(quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

To make out a claim for failure to train or supervise, the Plaintiffs must show, 1) that the City

inadequately supervised or trained the officer; 2) that there was a causal relationship between the failure to train or supervise and a violation of the plaintiffs constitutional rights: and 3) that such a failure to train or supervise amounted to deliberate indifference to the possibility of a constitutional violation. *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986). Liability may be created where the need for such training should have been obvious. *Bryan*, 219 F.3d at 460.

In *Bryan*, the court stated that there was a "highly predictable risk of injury from the improper use of force by an untrained officer..." *Id.* at 458. In *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), the court found that a constitutional failure to train was present where an officer had received rudimentary first aid training but allegedly not enough to recognize the seriousness of a detainees illness.

In the case sub judice, the "highly predictable risk of injury" occurred when the City allowed an officer who had not attended the Academy to patrol unsupervised by himself late at night, or, in this case, with his wife (which evinces a complete lack of supervision all its own). Further, there was clearly a lack of training of officers in the necessity of providing minimal emergency medical attention to someone who is not breathing or whose heart is not beating. None of the defendant officers chose to do this or allow it to be done until much too late. They waited until an ambulance arrived, long after the fact. Any reasonably trained officer would be aware of emergency CPR techniques, or at least would have allowed someone who did know how to do CPR and who was begging to be allowed to, to do so. The fact that no one on the scene did this demonstrates a failure to adequately train Stonewall officers to provide or be aware of the need for such care.

As well as the City of Stonewall Mississippi, the City Aldermen, Mayor and Chief of Police, both in their individual and official capacities, are liable for this failure to train and supervise city police officers. The Aldermen, as policymakers for the City of Stonewall, the Mayor, as the chief executive officer of the City, and the Chief of Police, as the chief law enforcement officer of the City,

were all directly responsible for seeing that the City's officers were provided training and proper supervision.

## CONCLUSION

The Defendants have faulted the Plaintiffs' pleadings as being insufficient. The Amended Complaint submitted in conjunction with this response in brief in opposition to the Defendants' Motion To Dismiss Based On Qualified Immunity pleads more than sufficient facts and adequately states a number of claims for both negligent and intentional torts as well as constitutional claims, as set out above. The Defendants' Motion is, therefore, not well taken, and the plaintiffs pray that it be denied in all respects with certain specific exceptions stated above.

This, the 11th day of October, 2016.

Respectfully submitted,

                               **KAYLA CLARK, ADMINISTRATRIX AND ON BEHALF OF ALL HEIRS AT LAW AND WRONGFUL DEATH BENEFICIARIES OF JONATHAN SANDERS, DECEASED**

                          By: /s/ *Toney A. Baldwin*
                                Toney A. Baldwin, Esq.

Of Counsel:

TONEY BALDWIN (MSB# 102161)
BALDWIN & BALDWIN, PLLC
748 N. President Street (39202)
Post Office Box 3199
Jackson, Mississippi 39207
Telephone: (601) 960-4533
Facsimile: (601) 960-9097

## CERTIFICATE OF SERVICE

I, Toney A. Baldwin, do hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system; further I have served a copy on the following:

> J. Richard Barry, Esq.
> James C. Griffin, Esq.
> Barry, Palmer, Thaggard, May & Bailey
> Post Office Box 2009
> Meridian, Mississippi 39202

SO CERTIFIED, this the 11th day of October, 2016.

/s/ *Toney A. Baldwin*
TONEY A. BALDWIN

<u>Of Counsel</u>:

TONEY BALDWIN (MSB# 102161)
BALDWIN & BALDWIN, PLLC
748 N. President Street (39202)
Post Office Box 3199
Jackson, Mississippi 39207
Telephone: (601) 960-4533
Facsimile: (601) 960-9097